IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

WAYNE G. LOVELY,                              :

    Plaintiff,                           :

                                    Case No. 3:06cv169

       vs.                              :

                                      JUDGE WALTER HERBERT RICE

THE UNITED STATES OF AMERICA,                :

    Defendant.                           :

---

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION TO
DISMISS (DOC. #19) AND OVERRULING, AS MOOT, PLAINTIFF'S
MOTION TO COMPEL DISCOVERY AND FOR SANCTIONS (DOC.
#30); JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND
AGAINST PLAINTIFF; INSTRUCTIONS TO COUNSEL; TERMINATION
ENTRY

---

The Plaintiff, Wayne G. Lovely, a former student at the University of Dayton

("U.D." or "University") and member of the Reserve Officer Training Corps

("ROTC"), brings suit against the United States and its agency, the United States

Army ROTC Battalion, at the University of Dayton. Doc. #1 (Compl.).  The original

Complaint alleged that the United States violated Lovely's rights, under the Privacy

Act (5 U.S.C. § 552a) and Army Regulation 340-21, by releasing a copy of an e-

mail regarding Lovely to a third party. Id. at 1.  Lovely requested compensatory

damages, costs and fees, and all other equitable relief to which he was entitled. Id.

at 4.  Subsequently, the Court granted Lovely leave to file an Amended Complaint,

in which he reiterated his Privacy Act claim and added thereto a claim for

intentional infliction of emotional distress, pursuant to the Federal Tort Claims Act

("FTCA"), 28 U.S.C. §§ 2671-2680, claiming that the Government "wrongfully and

intentionally inflicted emotional distress upon Lovely by releasing the

[aforementioned e-mail], making false statements about Lovely to U.D. students,

wrongfully interfering with the U.D. non-academic disciplinary board and ROTC

disenrollment hearings . . . and intimidating Lovely's intended witnesses before

these proceedings." Doc. #16 ¶ 21.  Lovely's prayer for relief, in his Amended

Complaint, mirrored that of his original Complaint. Id. at 6.

Currently pending before the Court are the Motion to Dismiss (Doc. #19) of

the United States[1] and Lovely's Motion to Compel Discovery and for Sanctions

(Doc. #30).  The Court will address each Motion in turn.


I.    FACTS

A.    General Facts

The Plaintiff, Wayne G. Lovely, Jr., was a student at the University of

Dayton and an ROTC scholarship cadet, at the time of the incidents in question.

---

[1]The Defendant previously filed a Motion to Dismiss, at Docket #7.  In response to the Plaintiff filing an Amended Complaint, the Defendant filed a Second Motion to Dismiss at Docket #19, which incorporates its briefings on its earlier Motion.  Thereafter, the Court overruled the Defendant's original Motion to Dismiss, without prejudice, given that the second Motion superseded the first such. Doc. #26.  In ruling on the Defendant's Motion to Dismiss herein, the Court will consider the parties' briefings on both of the Motions to Dismiss.

2

Doc. #7, Attach. #1 (2004 Lovely Aff.).  Just prior to the beginning of Lovely's

junior year, in the summer of 2003, Lieutenant Colonel Versalle Washington ("LtC.

Washington") became the Professor of Military Science ("PMS") and Director of the

Department of Military Science, at the University of Dayton. Doc. #7, Attach. #3

(Washington Aff.) at 1.  As such, he was a full professor on the faculty at the

University, as well as being an active duty Army officer. Id.

   In December 2003, Dr. Mark Ensalaco, the Director of the Department of

International Studies, discovered that Lovely had plagiarized a research paper that

accounted for one-half of his grade, in Dr. Ensalaco's course. Id.; Doc. #10, Ex. K7

(Ensalaco E-mail to Washington, dtd. Feb. 16, 2004).[2]  In accordance with

University policy, Lovely received a failing grade for the course, due to the

plagiarism. Doc. #10, Ex. K7.  Shortly thereafter, Dr. Ensalaco verbally informed

LtC. Washington of the plagiarism incident. Id.; Doc. #7, Attach. #3 at 1.  Dr.

Ensalaco then offered to prepare a statement concerning the incident, if LtC.

Washington would find it useful. Doc. #7, Attach. #3 at 1.

   The following month, a female ROTC cadet reported to LtC. Washington that

---

[2]The Plaintiff filed all of the exhibits to Docket #10 (Plaintiff's Response to the Defendant's original Motion to Dismiss) manually with the Court.

   Like many other documents contained in the record, in this case, this e-mail from Dr. Ensalaco to LtC. Washington is not authenticated.  Since there is no dispute between the parties as to the contents of this document, the Court will rely upon it, in ruling on the issues presented here.  Specific instructions are given to Defendant, at the conclusion of this Decision, however, regarding placing this evidence in proper Rule 56 form.  Failure to comply will cause this Court to vacate its ruling herein.

Lovely had sexually assaulted her, alleging that the incident had occurred four months earlier, in September 2003. Doc. #16, Ex. B (Washington E-mail to Col. Garcia, dtd. June 18, 2004).[3]  LtC. Washington suggested that she contact the police, but she declined. Doc. #7, Attach. #3 at 2.  LtC. Washington then advised her to go to the University counseling center, which she did.  Id.  At the advice of a counselor at the counseling center, the female cadet pursued University disciplinary proceedings against Lovely. Id.  The University scheduled a disciplinary board hearing for February 17, 2004. Doc. #7, Attach. #1 (2004 Lovely Aff.) at 4.

Prior to the sexual assault disciplinary hearing, the female cadet approached LtC. Washington.  She was aware of Lovely's plagiarism incident through other means and asked LtC. Washington if he could get a statement from Dr. Ensalaco about it. Doc. #7, Attach. #3 at 2.  LtC. Washington contacted Dr. Ensalaco and reminded him of his previous offer of a written statement regarding Lovely's plagiarism, to which Dr. Ensalaco responded by sending an e-mail describing the events in question.[4]  Id. at 1-2.  LtC. Washington printed the e-mail and gave a copy

---

[3]This e-mail from LtC. Washington to Col. Garcia is not authenticated.  Since there is no dispute between the parties as to the contents of this document, the Court will rely upon it, in ruling on the issues presented here. But see *supra* note 2.

[4]The text of the e-mail from Dr. Ensalaco to LtC. Washington reads as follows:

As per your request, I am writing in regards to Mr. Wayne Lovely who is registered as an International Studies major (Latin American concentration).  As I informed you at the end of the fall semester, I assigned Mr. Lovely a failing grade ("F") for my course, United States-

4

to the female cadet. Id.  This action is the crux of Lovely's Privacy Act claim.

The female cadet presented the copy of the e-mail at the University disciplinary hearing regarding the alleged sexual assault, held on February 17, 2004, in Lovely's presence. Doc. #7, Attach. #1 at 4.[5]  At the conclusion of the

---

Latin American Relations (POL 404), for the fall term.  I assigned the failing grade after I discovered Mr. Lovely had plagiarized a research paper.  According to the course syllabus, the final paper counted towards 50 percent of the final grade.  The failing grade for the paper resulted in a failing grade for the course.

I should mention also that during a meeting in my office in early January, Mr. Lovely admitted to having plagiarized a paper which he found on the Internet.  (I had suspected plagiarism in the case, and found the article independently on the Internet.)  Mr. Lovely admitted to this after he had received notification of the failing grade in the course.  During the meeting, Mr. Lovely made an effort to explain his action but to my consternation, he made no effort to apologize for conduct that violated university policy with regard to academic honesty.  I took the lack of remorse to be troubling.

As director of the International Studies program, I explained to Mr. Lovely that by failing the course it was unlikely that he would be able to graduate with a degree in International Studies with a concentration in Latin America, because POL 404 is required for all INS-Latin American concentrators.

Should you require any further information please do not hesitate to contact me at [xxxx].

Doc. #10, Ex. K7.

[5]According to Lovely's affidavit testimony, "[a]t the very end of the board hearing as the members were leaving [the female cadet] handed out a document which was assumed to be a summation of her argument[, but instead the] document was an e-mail pertaining to my plagiarism incident.  It had been written by Dr. Mark Ensalaco, the professor who taught the class in which I plagiarized, and addressed to LtC. Washington." Doc. #7, Attach. #1 at 4.

hearing, the Board voted to suspend Lovely from all University activities, until May 2005. Id. at 5; Doc. #10, Ex. K8 (Ltr. from University of Dayton to LtC. Washington, dtd. Mar. 18, 2004).[6]

The morning after the hearing, Lovely approached LtC. Washington about the e-mail the female cadet had presented at the hearing. Doc. #7, Attach. #1 at 4. LtC. Washington acknowledged giving the e-mail to the other cadet. Id.[7]  In later correspondence about this issue, LtC. Washington stated that he gave her the e-mail at the recommendation of her counselor, who told LtC. Washington that the e-mail "might be useful to address [Lovely's] character" at the upcoming disciplinary hearing. Doc. #16, Ex. B (Washington E-mail to Col. Garcia).

Six days later, on February 24, 2004, Lovely confronted Dr. Ensalaco about the e-mail. Doc. #7, Attach. #1 at 5.  Dr. Ensalaco acknowledged sending the e-mail to LtC. Washington. Id.  He told Lovely that LtC. Washington had asked for it for "records purposes" and never mentioned that it would be used for a University disciplinary board hearing. Id.

The following month, Lovely talked to several fellow cadets about the

---

[6]This letter from Mary Sue Hufnagle, Assistant Dean of Students, University of Dayton, to LtC. Washington is not authenticated.  Since there is no dispute between the parties as to the contents of this document, the Court will rely upon it, in ruling on the issues presented here. But see supra note 2.

[7]Specifically, Lovely's affidavit reads, "[u]pon learning of the e-mail, I immediately went to speak with LtC. Washington on 18 February at approximately 0845 hours.  I asked him how [the female cadet] obtained the document.  He verified that he gave it to her." Doc. #7, Attach. #1 at 4.

happenings surrounding the University hearing. Lovely states that these cadets told him that LtC. Washington told other cadets that Lovely had admitted to sexually assaulting the female cadet, at the hearing, which was not true. Doc. #10, Ex. B at 2 (2006 Lovely Aff.). Furthermore, Lovely states that LtC. Washington said he learned of this admission by listening to tapes from the hearing, which University personnel say did not happen. Id. LtC. Washington also seemingly told other cadets that they should support the female cadet in this situation, rather than Lovely. Id.

Eventually, on October 7, 2005, the United States Army disenrolled Lovely from ROTC. Doc. #7, Attach. #1 at 6-7; Doc. #10, Ex. Q (Dept. of Army Memo., dtd. Oct. 7, 2005).[8] During the disenrollment process, Lovely requested a copy of the Ensalaco e-mail, on April 12, 2005, along with other documents associated with that process. Doc. #10, Ex. I at 2 (Ltr. from Atty. Podlaski to Col. Frusha, dtd. Apr. 12, 2005).[9] After initially not complying with the request, the Government finally released some of the records, on July 12, 2005, to include the subject e-mail and a letter from LtC. Washington to Col. Garcia (which Lovely will

---

[8]This memorandum from the Department of the Army is not authenticated. Since there is no dispute between the parties as to the contents of this document, the Court will rely upon it, in ruling on the issues presented here. But see *supra* note 2.

[9]This letter from Lovely's legal counsel, Kevin P. Podlaski, to Col. Robert J. Frusha is not authenticated. Since there is no dispute between the parties as to the contents of this document, the Court will rely upon it, in ruling on the issues presented here. But see *supra* note 2.

later assert demonstrates LtC. Washington's willfulness in disclosing the subject e-mail). Doc. #10, Ex. M (Fax from Command Judge Adv. to Atty. Podlaski, dtd. July 12, 2005).[10]

On December 15, 2005, Lovely filed a claim against the United States Army, alleging, among other things, a violation of the Privacy Act and intentional infliction of emotional distress. Doc. #10, Ex. R (Ltr. from Atty. Podlaski to Armor Ctr. Cmdr., dtd. Dec. 15, 2005 & SF 95).[11]  The Army denied the claim on December 21, 2005. Doc. #10, Ex. S (Ltr. from Staff Judge Adv. to Atty. Podlaski, dtd. Dec. 21, 2005).[12]  Lovely then filed the subject litigation, on June 9, 2006. Doc. #1.

B.    Lovely's ROTC Contract

Lovely's Army Senior Reserve Officers' Training Corps (ROTC) Scholarship Cadet Contract ("ROTC Contract") is included in the record as Attachment #1 to

---

[10]The facsimile from the Command Judge Advocate to Lovely's legal counsel, Kevin P. Podlaski is not authenticated.  Since there is no dispute between the parties as to the contents of this document, the Court will rely upon it, in ruling on the issues presented here. But see supra note 2.

[11]The letter from Lovely's legal counsel, Kevin P. Podlaski, to the Commander, United States Army Armor Center at Fort Knox and accompanying Standard Form 95, is not authenticated.  Since there is no dispute between the parties as to the contents of this document, the Court will rely upon it, in ruling on the issues presented here. But see supra note 2.

[12]The letter the Office of the Staff Judge Advocate to Lovely's legal counsel, Kevin P. Podlaski is not authenticated.  Since there is no dispute between the parties as to the contents of this document, the Court will rely upon it, in ruling on the issues presented here. But see supra note 2.

8

the Defendant's Motion to Dismiss. Doc. #19, Attach. #1 (ROTC Contract, dtd.

Aug. 26, 2002).[13]  Pertinent to the issues at hand are the following details of that

Contract:

- The preamble's statement that "the sole purpose of the ROTC scholarship program is to produce officers for the United States Army." Id. at 1.

- The date Lovely's education is to commence - August 26, 2002; the date his education is to be completed - May 2005. Id.

- Lovely's agreement to "[r]emain a full-time student at the [University of Dayton] until I receive my degree." Id. at 2 ¶ 1c.

- Lovely's agreement to "[m]aintain eligibility for enrollment in ROTC, enlistment in the USAR, and commissioning, as defined by statute, Army regulation, and this contract, throughout the period of this contract . . . ." Id. ¶ 1i

- An expression of understanding that if Lovely is disenrolled from the ROTC program for, among other things, "failing to complete the educational requirements specified in this agreement or other educational requirements for ROTC cadets as specified in Army Regulations, incorporated herein by reference" or "misconduct," that the Army may order him to active duty as an enlisted soldier or require him to reimburse the Government for his educational costs. Id. at 6 ¶ 7.

The ROTC Contract also sets forth the financial terms of the Contract, to include

the Government's agreement to pay, for three years, Lovely's tuition, educational

fees, textbooks, a subsistence allowance, and pay, during certain periods. Id. at 9.

---

[13]This ROTC Contract is not authenticated.  Since there is no dispute between the parties as to the contents of this document, the Court will rely upon it, in ruling on the issues presented here. But see supra note 2.

9

II.     RULE 12(b)(1) MOTION TO DISMISS STANDARD

When a defendant moves to dismiss on grounds of lack of subject matter jurisdiction, "the plaintiff has the burden of proving jurisdiction in order to survive the motion." Nichols v. Muskingum College, 318 F.3d 674, 677 (6th Cir. 2003) (quoting Moir v. Greater Cleveland Reg'l Transit Auth., 895 F.2d 266, 269 (6th Cir. 1990)). This Court has previously recognized that the procedural framework for ruling on a motion to dismiss for lack of subject matter jurisdiction, brought under Federal Rule of Civil Procedure 12(b)(1), is as follows:

> Rule 12(b)(1) motions to dismiss based upon subject matter jurisdiction generally come in two varieties. A facial attack on the subject matter jurisdiction alleged by the complaint merely questions the sufficiency of the pleading. In reviewing such a facial attack, a trial court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss. On the other hand, when a court reviews a complaint under a factual attack, . . . no presumptive truthfulness applies to the factual allegations. Such a factual attack on subject matter jurisdiction commonly has been referred to as a "speaking motion."

McGuire v. Ameritech Servs., 253 F. Supp. 2d 988, 993-94 (S.D. Ohio 2003) (quoting Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990)); Fed. R. Civ. P. 12(b)(1). Courts may consider facts outside the pleadings, in ruling on a factual attack 12(b)(1) motion. Courts do not, however, convert Rule 12(b)(1) motions into motions for summary judgment, "as facts which bear on jurisdiction are not the same as facts which bear on the merits." McGuire, 253 F. Supp. 2d at 994.

10

III.    ANALYSIS

The United States moves to dismiss both the Privacy Act claim and the Plaintiff's claim under the FTCA, asserting that this Court lacks subject matter jurisdiction, as to both claims.  Specific to the Privacy Act claim, the Government argues, among other things, that the Plaintiff's claim is time-barred since he did not file it within the statutorily required time frame. Doc. #7.  The Court finds this argument to be dispositive, so it will not address the remaining arguments, on this claim.[14]  With regard to the Plaintiff's claim of intentional infliction of emotional distress, under the FTCA, the Government argues, and the Court agrees, that the claim is barred by the <u>Feres</u> doctrine. Doc. #19.  The Court will address these arguments in turn.

A.    Privacy Act Claim

The Plaintiff brings suit for a violation of the Privacy Act, claiming that LtC. Washington's release, to the female cadet, of his e-mail from Dr. Ensalaco violates the Privacy's Act prohibition on disclosing a record that is contained in a system of records, without the prior written consent of the individual to whom the record pertains. Doc. #16 (Am. Compl.) at ¶ 17; 5 U.S.C. § 552a(b), (g)(1)(D).

---

[14]The Defendant also argues that the Privacy Act claim should be dismissed because it does not comport with the following requirements of that Act:  the document in question (the e-mail from Dr. Ensalaco to LtC. Washington) is not a "record contained within a system of records," the Complaint does not seek actual damages and the Complaint fails to name a proper party. Doc. #7 (Original Mot. to Dismiss) at 9-14.

Specifically, the Plaintiff alleges that, by giving the female cadet a copy of the subject e-mail, LtC. Washington wrongfully disclosed a record, in violation of 5 U.S.C. § 552a(b). See Doc. #16 (Compl.) ¶17. That Section provides that

> [n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . .

5 U.S.C. § 552a(b). This language is followed by certain delineated exceptions, none of which are applicable in this case. Id. Paragraph (g)(1), of the Privacy Act, further provides that an individual may bring a civil action against an agency, for a violation of this provision, and the United States district courts shall have jurisdiction over any such actions. 5 U.S.C. § 552a(g)(1)(D).

The Privacy Act also contains a statute of limitations, which reads, in pertinent part, as follows:

> An action to enforce any liability created under this section may be brought in the district court of the United States in the district in which the complainant resides . . ., within two years from the date on which the cause of action arises, except that where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within two years after discovery by the individual of the misrepresentation. . . .

5 U.S.C. § 552a(g)(5) (emphasis added). Thus, a plaintiff must bring a Privacy Act claim within two years from the date on which the cause of action arises. Id.; see also Cannon-Harper v. United States Postmaster Gen., 2006 U.S. Dist. LEXIS

12

66981, *6 (E.D. Mich. Sept. 19, 2006) (noting that a cause of action is considered to have arisen, in a 5 U.S.C. § 552a(b) wrongful disclosure case, when the plaintiff knows or has reason to know of the alleged violation) (citing Tijerina v. Walters, 821 F.2d 789, 798 (D.C. Cir. 1987)).[15]  An exception to the rule occurs, however, under the following conditions:  (1) when an agency has materially and willfully misrepresented any information required, under the Privacy Act, to be disclosed to an individual, and (2) when the information so misrepresented is material to the establishment of the agency's liability to the individual, under the Privacy Act. 5 U.S.C. § 552a(g)(5).  If the exception applies, the action must be brought within two years after the individual discovers the misrepresentation. Id. [16]

The Defendant argues that the Plaintiff's Privacy Act claim is barred by the Act's two-year statute of limitations, because the Plaintiff "knew or should have

---

[15]Contrast Edwards v. Horner, which applies a  slightly different standard in the context of a denial of a request to amend records, under 5 U.S.C. § 552a(d)(2). 1991 U.S. App. LEXIS 15963 (6th Cir. July 11, 1991).  In these cases, a cause of action arise "when the agency issues a final decision on the matter and when a person knows or has reason to know that the request has been denied." Id. at *11.

[16]The Ninth Circuit summarizes the rule and its exception as follows:

In general then, an individual must bring suit within two years of the unauthorized disclosure except where an agency has willfully misrepresented information required to be disclosed to the individual and which would be material to establishing the agency's liability under the Privacy Act; in such exceptional circumstances, § 552a(g)(5) affords the individual two years from the time he discovers the agency's actions.

Oja v. United States Army Corps of Eng'rs, 440 F.3d 1122, 1128 (9th Cir. 2006).

known" of the violation, on or about February 17, 2004, which was the day of the disciplinary hearing, but he did not file this action until June 9, 2006 - - almost four months too late. Doc. #7 (Original Mot. to Dismiss) at 6-9; Doc. #13 (Second Mot. to Dismiss) at 1-5.  The Plaintiff responds with the following arguments:  (1) the statutory period did not begin to run on February 17, 2004, because the Government "materially and willfully misrepresented" certain information required to be disclosed; (2) the statutory period did not begin to run until the Plaintiff suffered "adverse effects" when he was officially disenrolled by the Army; and (3) the statutory period was tolled while the Plaintiff exhausted his administrative remedies. Doc. #10 at 8-15.  The Court will address these three arguments in turn, after first taking note that the Court lacks jurisdiction, under the Privacy Act, if the Plaintiff did not bring his action within the statutory parameters of 5 U.S.C. § 552a(g)(5). Davis v. Gross, 1984 U.S. App. LEXIS 14279, *4 (6th Cir. 1984); see also Akutowicz v. United States, 859 F.2d 1122, 1126 (2d Cir. 1988) ("[W]here the government's consent as sovereign to be sued is conditioned upon the filing of suit within a specified period of time, strict compliance with that condition is a jurisdictional prerequisite.") (internal quotations omitted); Cannon-Harper v. United States Postmaster Gen., 2006 U.S. Dist. LEXIS 75313, **3-4 (E.D. Mich. Oct. 17, 2006) (same principle).

1.  <u>Willful Misrepresentation of Information Required to be Disclosed</u>

The Plaintiff argues the "material and willful misrepresentation" exception to the two-year statute of limitations, based on the fact that the Government was dilatory in sending him two requested documents - - the e-mail at issue and a copy of a letter from LtC. Washington to Col. Garcia (which allegedly demonstrates LtC. Washington's willfulness in disclosing the subject e-mail).[17] Doc. #10 at 8-12; <u>see also</u> <u>id.</u> at 11 (noting that Lovely submitted his request for these documents on April 12, 2005, but did not receive the same until three months later).  The Plaintiff goes on to argue that "[b]y refusing to produce these documents[,] the Government materially misrepresented their existence." <u>Id.</u> at 11.[18]  In support of

---

[17]In order to be awarded damages in a wrongful disclosure Privacy Act suit, a plaintiff must demonstrate that an agency acted "in a manner which was intentional or willful." 5 U.S.C. § 552a(g)(4).

[18]Although the Court finds it unnecessary to decide this issue, since it finds that possession of the documents was not material to the establishment of the Defendant's liability, it is leery of adopting the Plaintiff's proposition that the Government "materially misrepresented the existence of the documents" by refusing to produce them.  First and foremost, the Court notes that there is no doubt that the e-mail, which is the subject of this litigation, existed.  The Plaintiff saw the e-mail at the hearing (although it is unclear whether he actually read it) and spoke to both LtC. Washington and Dr. Ensalaco about it shortly thereafter. Further, withholding a document, of which a plaintiff knows its existence and knows, at least generally, of its contents, is not the type of "material and willful misrepresentation" found by other courts to be violative of 5 U.S.C. § 552a(g)(5). <u>E.g.</u>, <u>Lacey v. United States</u>, 74 F. Supp. 2d 13, 16-17 (D.D.C. 1999) (over the course of a year, government agent repeatedly advised plaintiffs not to sue, telling them they lacked evidence to bring suit and that they should wait for the agency to finish its investigation); <u>Jarrell v. United States Postal Service</u>, 1985 U.S. App. LEXIS 27521, **11-12 (D.C. Cir. 1985) (agency had excised certain parts of documents and the plaintiff had no knowledge of the excised information).

this argument, the Plaintiff cites four cases, all from the Federal District Court of the District of Columbia, for the proposition that the Privacy Act limitations period may be tolled when a plaintiff "despite all due diligence is unable to obtain vital information bearing on the existence of his claim." Id. at 8-9 (quoting Levant v. Roche, 384 F. Supp. 2d 262, 270 (D.D.C. 2005) and citing Lacey v. United States, 74 F. Supp. 2d 13 (D.D.C. 1999); Marin v. United States Dept. of Def., 1998 WL 779101 (D.D.C. Oct. 23, 1998); Pope v. Bond, 641 F. Supp. 489 (D.D.C. 1986)).

The Defendant counters by pointing out that, on or about February 17, 2004 (the date of the Plaintiff's University disciplinary hearing), the Plaintiff knew of the contents of the e-mail and knew that LtC. Washington had willfully disclosed the same to the female cadet, based on the Plaintiff's attendance at the hearing and his confrontations with both LtC. Washington and Dr. Ensalaco, within days after the hearing. Doc. #13 at 3.  In effect, the Defendant argues that the Government's transmittal of the two documents to the Plaintiff was not "material to the establishment of the liability of the agency to the [Plaintiff]," as required by the Privacy Act and, thus, the "material and willful" exception to the statute of limitations is inapplicable. Id.  The Court agrees.

The Plaintiff in this case admittedly knew that LtC. Washington had intentionally given the female cadet the subject e-mail on or about February 17, 2004, because he witnessed her in possession of the e-mail and because LtC.

16

Washington apprised him of both the disclosure and the intentional nature of the disclosure of the same the next day. Doc. #7, Attach. #1 (2004 Lovely Aff.) at 4-5.  Thus, the Plaintiff's actual possession of the e-mail was not "material to the establishment of the agency's liability to the individual, under the Privacy Act," as required for the statute of limitations exception under 5 U.S.C. § 552a(g)(5).  Accord Bowyer v. United States Dep't of Air Force, 875 F.2d 632, 636 (7th Cir. 1989) (in suit alleging improper maintenance of records, "the relevant fact is not when the plaintiff first had physical possession of the particular records, but rather when he first knew of the existence of the records.  For this purpose, even unsubstantiated hearsay and rumors are enough to find knowledge sufficient to trigger the statute of limitations") (internal quotations omitted); Nwangoro v. Department of the Army, 952 F. Supp. 394, 397 (N.D. Tex. 1996) ("A cause of action accrues once the plaintiff knows or has reason to know of the adverse action.  Thus, the limitations period commences not when the plaintiff first obtains possession of the particular records at issue, but rather when he first knew of their existence.") (citing Rose v. United States, 905 F.2d 1257, 1259 (9th Cir. 1990) and Bowyer, 875 F.2d at 637).  Thus, even assuming that this Court was in agreement with the cited cases from the District Court of the District of Columbia, the proposition propounded therein (that the Privacy Act limitations period may be tolled when a plaintiff, "despite all due diligence is unable to obtain vital information bearing on the existence of his claim") is inapposite here, because the

17

possession of the e-mail was not "vital information bearing on the existence of his claim," since the Plaintiff already knew of the disclosure of the contents of the subject document, as well as the intentionality of the same.[19]

Even assuming, arguendo, that the Defendant's withholding of the requested documents could be framed as being material to the establishment of the Defendant's liability, the time period between his request and receipt of the same was only three months (April 12 - July 12, 2005).  Therefore, the statutory period would only have been tolled for three months.  However, the Plaintiff was almost four months late in filing his Complaint, in that he had all the facts necessary to

_____

[19]Besides the inapplicability to the facts of this case, the holdings in the cited cases are also inapposite for various other factual and legal reasons. E.g., Levant v. Roche, 384 F. Supp. 2d 262, 270 (D.D.C. 2005) (which recited the quoted proposition, but did not apply it; finding that the plaintiff was not deprived of a reasonable time in which to file suit so his claims were time-barred); Lacey v. United States, 74 F. Supp. 2d 13, 16 (D.D.C. 1999) (finding the plaintiffs' claims were not time barred, but not because they had been unable to obtain vital information, but because the government made "material and willful misrepresentations to [them]" by, for example, advising them not to sue, telling them they lacked evidence to bring a suit and advising them to wait for the INS to finish its investigation before bringing a suit); Marin v. United States Dept. of Def., 1998 WL 779101, *2 (D.D.C. Oct. 23, 19998) (not addressing plaintiff's inability to obtain information, but, instead, plaintiff's allegations of the government's deliberate alteration of his records after the statute began to run, which triggered the material and willful tolling provision); Pope v. Bond, 641 F. Supp. 489, 499-500 (D.D.C. 1986) (finding that the statute of limitations had not run, in part, because "plaintiff's specific requests for access to the FAA files containing the evidence of violations [were] repeatedly denied by the FAA," but this case is differentiated from the present case, because the Pope plaintiff was not aware of the existence of, or the disclosure of, some of the files in question until discovery, when the FAA was forced to turn over the files it had previously refused to turn over and, therefore, did not know or have reason to know of the Privacy Act violation until such time).

"know or have reason to know" of the Privacy Act violation on the day after the disciplinary hearing, February 18, 2004, when LtC. Washington confirmed that he had given the subject e-mail to the female cadet.

In sum, then, the Court is not persuaded that the two year statute of limitations was tolled by the Defendant's failure to directly produce the requested documents.  Even assuming, arguendo, that it was so tolled, however, the Plaintiff was still late in initiating the present litigation.  Thus, the Court will turn to the Plaintiff's next argument in opposition to the Defendant's statute of limitations challenge.


      2.    <u>Statutory Period did not Begin until Plaintiff Suffered "Adverse Effects"</u>

The Plaintiff next argues that the statutory period did not begin to run until the Army disenrolled him, on October 7, 2005, because it was then that he suffered "adverse effects" from the Privacy Act violation. Doc. #10 at 12-13.  In so arguing, the Plaintiff asserts that "[a] claim for unlawful disclosure of information under the Privacy Act, § 552a(g)(5), does not accrue for statute of limitation purposes until a claim for damages is substantiated." Doc. #10 at 12 (citing <u>Lacy v. United States</u>, 74 F. Supp. 2d 13 (D.D.C. 1999) and <u>Marin v. United States</u>, 1998 WL 779101 (D.D.C. 1998)).

The Plaintiff's argument here is not well taken.  First, because the two cited cases from the District Court for the District of Columbia do not support the

Plaintiff's contention that, as a blanket rule, the Privacy Act statutory period does not start until a plaintiff suffers "adverse effects" from a violation. <u>Lacy</u>, 74 F. Supp. 2d at 16-27 (statutory period didn't start until claim had been substantiated, but only because, in the meantime, the Government had repeatedly advised the plaintiffs that their claim was insufficient and they should not bring suit); <u>Marin</u>, 1998 WL 779101 at *2 (pinning start of statute of limitations on date on which the "injury for which relief is sought was triggered," which was not the same as the date on which the claim for damages was substantiated).  Furthermore, and most importantly, however, the Privacy Act quite clearly spells out when the statutory period runs and when it is tolled, in 5 U.S.C. § 552a(g)(5), but does not include a tolling period pending an "adverse effect."  Since the Plaintiff has pointed to no relevant case law that supports a tolling of the limitations period until such time as a plaintiff substantiates that he has suffered an adverse effect, and, since the Court has found none, the Court finds that the statute of limitations was not tolled until the date that the Army disenrolled the Plaintiff.

### 3.   Exhaustion of Administrative Remedies

The Plaintiff's final argument as to why his claim is not time barred is that the two year statue of limitations was tolled while he pursued his administrative remedies. Doc. #10 at 13-15.  In so arguing, the Plaintiff concedes that the Privacy Act does not specifically require a claimant to exhaust administrative

20

remedies before bringing suit, but asserts that "such a requirement is imposed as a general principal of administrative law." Id. at 13 (quoting Hammie v. SSA, 765 F. Supp. 1224, 1225 (E.D. Pa. 1991); citing Haase v. Sessions, 282 U.S. App. D.C. 163 (D.C. Cir. 1990) and Nurse v. Sec'y of the Air Force, 231 F. Supp. 2d 323 (D.D.C. 2002)).  The Plaintiff goes on to explain that he filed a claim for damages with the Army on December 15, 2005, which was denied on December 21, 2005, at which time he suggests that the "Government thereby ceded jurisdiction to this Court over [LtC.] Washington's willful violation of the Privacy Act." Id. at 14.  The Plaintiff is apparently arguing that the statute of limitations should not have begun to run until December 15, 2005. See id. ("Plaintiff filed this Complaint on June 9, 2006, within . . . six months of the Government ceding jurisdiction after Lovely exhausted his administrative remedies.").

The Privacy Act sets forth four causes of action, to wit:

1.   Failure to amend an individual's record, in accordance with his request. 5 U.S.C. § 552a(g)(1)(A).

2.   Refusal to comply with an individual's request for records. 5 U.S.C. § 552a(g)(1)(B).

3.   Failure to maintain accurate records, when an individual suffers an adverse determination based on those inaccurate records. 5 U.S.C. § 552a(g)(1)(C).

4.   A catchall provision, which authorizes suit if an agency fails to comply with any other command of the Privacy Act.  One of those commands is contained in section (b) of the Act, which forbids an agency from disclosing a record to a third party without the prior written consent of the individual to whom the record pertains. 5

U.S.C. § 552a(b), (g)(1)(D).[20]

The statute further provides that the United States may be liable for damages, in certain circumstances, for violations of the third and fourth causes of action, but not for violations of the first or second such. 5 U.S.C. § 552a(g)(4) (imposing liability for damages, if a court determines that the agency acted in an intentional or willful manner, in violating either § 552a(g)(1)(C) or (D)).

Although the Sixth Circuit has not addressed this issue, the consensus of the courts that have is that plaintiffs are required to exhaust administrative remedies when alleging that an agency has failed to act, in violation of paragraphs (A) and (B) of § 552a(g)(1)) (failure to amend or disclose records),[21] but are not required to do so, when seeking damages for alleged violations of paragraphs (C) and (D) of § 552a(g)(1) (failure to properly maintain a record, which leads to an adverse determination, or some other failure to comply with the Privacy Act that causes an adverse effect).[22]  This distinction is logical, given that an agency should

---

[20]The Plaintiff's claim, in this case, falls within the fourth provision. Doc. #16 (Compl.) ¶ 17.

[21]E.g., Quinn v. Stone, 978 F.2d 126 (3rd Cir. 1992) (holding that there is an administrative exhaustion requirement for suits for amendment of records); see also Pollack v. Department of Justice, 49 F.3d 115, 117 n.1 (4th Cir. 1995) (noting that the plaintiff's Privacy Act claim was not properly before the district court because he did not first exhaust administrative remedies where he was requesting documents).

[22]E.g., Christensen v. United States Dept. of Interior, 2004 U.S. App. LEXIS 19835, **5-6 (10th Cir. Sept. 22, 2004) ("[T]here is no basis for tolling the limitations period while Plaintiff pursued his administrative claim, because there is

22

be afforded an opportunity to first respond to a request for documents or amendments to documents, before a court gets involved. As to claims for damages, however, there is no statutory authority for an agency to award damages for improper actions it has already taken, so those claims are more appropriately within the court's area of responsibility. See Pope v. Bond, 641 F. Supp. 489, 500 (D.D.C. 1986).

The first two cases cited by the Plaintiff fall within the first such category of suits, wherein the courts determined that exhaustion was appropriate when an agency allegedly failed to release records, in violation of § 552a(g)(1)(B) (rather than (g)(1)(D)), so are not applicable here. Nurse v. Sec'y of the Air Force, 231 F. Supp. 2d 323, 327 (D.D.C. 2002); Hammie v. SSA, 765 F. Supp. 1224, 1225 (E.D. Pa. 1991). Nor is the third case cited by the Plaintiff helpful to his case, in that it specifically states that claims brought under § 552a(g)(1)(D) "do[] not require exhaustion." Haase v. Sessions, 893 F.2d 370, 374 (D.C. Cir. 1990).

The Court finds, therefore, that the Privacy Act does not require that the Plaintiff exhaust administrative remedies before bringing suit for an alleged violation of 5 U.S.C. § 552a(g)(1)(D) and, thus, is not persuaded by the Plaintiff's third and

---

no administrative exhaustion requirement when a plaintiff seeks damages under the Privacy Act."); Haase v. Sessions, 893 F.2d 370, 374 (D.C. Cir. 1990) (noting that § 552a(g)(1)(D) claims do not require exhaustion); Diederich v. Dept. of Army, 878 F.2d 646, 647-48 (2d Cir. 1989) (holding that the exhaustion doctrine does not bar suits for damages); Salih Rashad Majied v. United States, 2007 U.S. Dist. LEXIS 29068, **12-14 (W.D. Va. 2007) (same); Uhl v. Swanstrom, 876 F. Supp. 1545, 1560-61 (N.D. Iowa 1995), aff'd 79 F.3d 751 (8th Cir. 1996) (same).

23

final argument as to why his Privacy Act claim should not be time barred.

Since the Plaintiff filed his claim over four months after the two year statutory period expired and because the statute was not tolled in the meantime, the Plaintiff's Privacy Act claim is barred by the statute of limitations and the Defendant's Motion to Dismiss the Plaintiff's Privacy Act claim (Doc. #19), for lack of subject matter jurisdiction, is SUSTAINED.

B.    FTCA Claim for Intentional Infliction of Emotional Distress

The Plaintiff's Complaint alleges that the Defendant wrongfully and intentionally inflicted emotional distress upon him, in violation of the FTCA, by taking the following actions:  releasing the e-mail to the female cadet, making false statements about him to other students, wrongfully interfering with the University non-academic disciplinary board hearing process, wrongfully interfering with the ROTC disenrollment hearing process and intimidating his intended witnesses in these hearings. Doc. #16 ¶¶20-24.  Among other things, the Defendant argues that the Court does not have subject matter jurisdiction to hear this claim, because it is barred by the Feres doctrine, which disallows tort claims that arise from activities incident to military service. Doc. #19 (Def.'s Mot. to Dismiss) at 4-12 (citing Feres v. United States, 340 U.S. 135 (1950)); Doc. #24 (Def.'s Reply Mem.) at 1-4.

24

The Court will now turn to an analysis of the <u>Feres</u> doctrine, as it applies to the facts of this case.  As an initial matter, however, the Court notes that if the Plaintiff's claim is <u>Feres</u>-barred, the Court does not have subject matter jurisdiction over the litigation, pursuant to Federal Rule of Civil Procedure 12(b)(1).[23] <u>Jackson v. United States</u>, 110 F.3d 1484, 1486 (9th Cir. 1997); <u>Wake v. United States</u>, 89 F.3d 53, 57 (2d Cir. 1996); <u>Wojton v. United States</u>, 199 F. Supp. 2d 722, 731-34 (S.D. Ohio 2002) (considering <u>Feres</u> challenge as factual attack on court's subject matter jurisdiction).

       1.    <u>The Feres Doctrine in General</u>

The FTCA allows a plaintiff to sue the government for injuries caused by a government employee's negligence, when acting within the scope of employment, under circumstances where a private individual would be liable for such negligence. 28 U.S.C. § 1346(b).  This provision, however, is subject to a judicially-created

---

[23]As further explained by the Second Circuit:

The FTCA was intended as a partial waiver of sovereign immunity. "Absent a waiver, sovereign immunity shields the federal Government and its agencies from suit. . . . [Thus, s]overeign immunity is jurisdictional in nature."  Because the <u>Feres</u> doctrine concerns the waiver of sovereign immunity, a question of whether a FTCA claim is barred by <u>Feres</u> is necessarily one of jurisdiction.

<u>Wake v. United States</u>, 89 F.3d 53, 57 (2d Cir. 1996) (quoting <u>Dorking Genetics v. United States</u>, 76 F.3d 1261, 1264 (2d Cir. 1996) and citing  <u>Feres v. United States</u>, 340 U.S. 135 (1950), among others)).

exception, as spelled out by the United States Supreme Court, in <u>Feres v. United States</u>, 340 U.S. 135 (1950).  In <u>Feres</u>, the Court held that the FTCA's waiver of sovereign immunity does not apply to certain negligence actions brought by military personnel.  Specifically, the Court ruled that the government "is not liable under the [FTCA] for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." <u>Id.</u> at 146.

When deciding cases involving a <u>Feres</u> challenge, a court's analysis often turns on whether an individual has sustained an injury "incident to military service." The Sixth Circuit instructs that such injuries are <u>Feres</u>-barred because they are the types of claims "that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." <u>Brown v. United States</u>, 462 F.3d 609, 614-15 (6th Cir. 2006) (quoting <u>United States v. Shearer</u>, 473 U.S. 52, 59 (1985)).[24]  The Appellate Court further instructs that

---

[24]The Sixth Circuit has provided an excellent summary of the two subsequent Supreme Court cases, which have applied the <u>Feres</u> doctrine, in cases similar to the one at bar:

In [<u>United States v. Shearer</u>, 473 U.S. 52 (1985)], plaintiff's decedent was an Army private who was kidnapped and murdered by another serviceman while off duty and away from the base.  Plaintiff alleged that Army negligence had caused her son's death.  In reversing the court of appeals' conclusion that "an off-duty serviceman not on the military base and not engaged in military activity at the time of injury, can recover under FTCA," <u>Shearer v. United States</u>, 723 F.2d 1102, 1106 (3d Cir. 1983), the Court found the relevant inquiry to be not the situs of the act or incident but "whether the suit requires the civilian court to second-guess military decisions, and whether the suit might impair essential military discipline." 473 U.S. at 57 (citations

26

"courts should take a flexible approach to government claims of immunity in

actions brought under the Federal Tort Claims Act," id. at 615 (citing Shearer, 473

U.S. at 57), and points out that

> Supreme Court precedents make it clear that in recent years the Court
> has embarked on a course dedicated to broadening the Feres doctrine
> to encompass, at a minimum, all injuries suffered by military personnel
> that are remotely related to the individual's status as a member of the
> military, without regard to the location of the event, the status
> (military or civilian) of the tortfeasor, or any nexus between the injury-
> producing event and the essential defense/combat purpose of the
> military activity from which it arose.

Fleming v. United States Postal Serv., 186 F.3d 697, 699 (6th Cir. 1999)

(emphasis added) (citing Skees v. United States, 107 F.3d 421, 423-24 (6th Cir.

---

> omitted).  The Court concluded that an impermissible level of civilian
> judicial involvement would result if this type of case were permitted,
> since commanding officers would likely have to testify about their
> practices and policies in disciplining subordinates and dictating their
> off-base conduct. Id. at 58.

> In [United States v. Johnson, 481 U.S. 681 (1987)], Johnson,
> plaintiff's husband was killed in a helicopter crash during a rescue
> mission due to the alleged negligence of an air traffic controller
> employed by the Federal Aviation Administration (FAA).  The Court
> once again reversed the court of appeals by applying the Feres
> doctrine, even though the alleged negligence did not involve any
> military personnel.  In the same way it had held that the situs of the
> incident was not determinative in Shearer, the Court found that the
> status of the tortfeasor as a civilian governmental employee was
> similarly insignificant.  Since the accident had occurred while the pilot
> was engaged in a service-related mission, suit was barred because its
> maintenance would "necessarily implicate[] the military judgments and
> decisions that are inextricably intertwined with the conduct of the
> military mission." 107 S. Ct. at 2069.

Major v. United States, 835 F.2d 641, 644 (6th Cir. 1987).

27

1997) (noting that incident-to-service is not "limited to military training and combat"); Sidley v. United States, 861 F.2d 988, 990 (6th Cir. 1988) ("The Feres doctrine extends beyond situations where the soldier is acting pursuant to orders or while subject to direct military command or discipline."); Major v. United States, 835 F.2d 641, 644-45 (6th Cir. 1987));[25] see also Mackey v. United States, 226 F.3d 773, 776 (6th Cir. 2000) ("[T]he Feres doctrine applies to intentional torts.").

Other courts have determined that "whether the activity [was] limited to military personnel and whether the service member was taking advantage of a privilege or enjoying a benefit conferred as a result of military service" is also relevant in deciding these cases. Wake v. United States, 89 F.3d 53, 58 (2d Cir. 1996) (finding plaintiff's claim Feres-barred where ROTC cadet suffered injuries while a passenger in a car, which was owned and operated by the ROTC program and the cadet was being transported to a military clinic for a mandatory physical examination) (citing Sanchez v. United States, 878 F.2d 633, 634 (2d Cir. 1989),

---

[25] Contrast Fleming v. United States Postal Serv., 186 F.3d 697 (6th Cir. 1999), where the Sixth Circuit determined that the Feres doctrine was inapplicable. The plaintiff's injury in that case occurred when he was in an accident driving to a restaurant, which was not on military property, before reporting for military duty. Because the act in question was not even remotely related to the individual's status as a member of the military, the Court determined that Feres did not bar suit against the driver of the other vehicle. In so doing, the Court cited favorably the holding in Green v. Hall, 8 F.3d 695, 700 (9th Cir. 1993), which determined that a challenged action was not Feres barred if it was a "distinctly nonmilitary act, [that was] not done under orders, was not intended to benefit the military, and did not occur on military property." 186 F.3d at 700.

which barred a claim for negligent servicing of automobile where use of base
service station was limited to service members and civilians connected with
military mission and suit would involve impermissible civilian inquiry into policies
and procedures for operation of military controlled facility).

### 2. Feres Doctrine and ROTC Students

Although the Sixth Circuit has not had occasion to decide such a case, other
courts have determined that the Feres doctrine applies to ROTC cadets and is to be
applied, as in the case of other military personnel, to bar claims made by ROTC
cadets for injuries sustained incident to military service. E.g., Brown v. United
States, 151 F.3d 800, 805 (8th Cir. 1998) (injury allegedly caused by negligence
of Army surgeon); Wake v. United States, 89 F.3d 53 (2d Cir. 1996) (barring claim
for injury sustained in military vehicle accident while returning from naval hospital
where cadet had undergone precommissioning physical); Morse v. West, 975 F.
Supp. 1379, 1381 (D. Colo. 1997) (alleging, among other things, unwanted sexual
advances from male cadet, hostile environment, retaliation for reporting sexual
harassment, intentional infliction of emotional distress); Mangan v. Weinberger,
1987 U.S. Dist. LEXIS 14159 (D. Minn. Feb. 13, 1987) (contending improper
assessment of cadet as possessing a personality disorder and that various
defendants conspired together to disenroll him from ROTC, based upon affiliation
with certain political party). The focus in these cases, just as it is in all Feres

29

cases, is whether the ROTC cadet sustained his or her alleged injuries incident to service.  The Court's task in this case, then, is to do the same.

>     3.    Whether Lovely Sustained his Alleged Injuries Incident to
>           Military Service

In his Complaint, the Plaintiff alleges that he suffered emotional distress because of the following actions by LtC. Washington: release of the e-mail to the female cadet, making false statements about him to other students, wrongfully interfering with the University non-academic disciplinary board hearing process, wrongfully interfering with the ROTC disenrollment hearing process, and intimidating his intended witnesses in these hearings. Doc. #16 ¶¶20-24.  In his Memorandum in Opposition to the Defendant's Motion to Dismiss, the Plaintiff seems to have dropped the emphasis on the ROTC disenrollment hearings, in that he points only to the following actions, of LtC. Washington, relative to the University disciplinary board hearing:

- Conspiring with the female cadet and her counselor to discredit the Plaintiff before the University board

- Giving the female cadet the e-mail for her use at the University board

- Making false statements to Dr. Ensalaco, in obtaining the e-mail at issue[26]

---

[26]Presumably, the false statement is that LtC. Washington intended to put the e-mail in Lovely's records.

30

- Falsely telling other students that the Plaintiff admitted to "raping" the female cadet at the hearing, when, in fact, he denied this accusation; further, wrongfully stating that he, Washington, had learned of this admission because he listened to tapes of the hearing

Doc. #22 at 3, 15.  In both his Complaint and his Memorandum, the Plaintiff also alleges that LtC. Washington's acts included intimidating and unlawfully influencing the Plaintiff's witnesses before the University hearing. Doc. #16 ¶21;Doc. #22 at 3, 15.  In support of this allegation (and the other allegations in the Memorandum), the Plaintiff points generally to Exhibits A, B, C and D, to his first response to the Defendant's Motion to Dismiss (Doc. #10). Doc. #22 at 3, 15.  The Court was unable to find any support in the generally cited documents for the intimidation/ unlawful influence allegation, however, so will not consider the same herein.

In order to determine whether the Plaintiff's claim is Feres-barred, the Court must now determine whether the noted actions were taken "incident to the Plaintiff's military service."  In so doing, the dispositive inquiry is whether the Plaintiff "stood in some sort of relationship to the service such that the events arose out of activity incident to service." Morse v. West, 975 F. Supp. 1379, 1381 (D. Colo. 1997) (citing Quintana v. United States, 997 F.2d 711, 712 (10th Cir. 1993)); see also Duffy v. United States, 966 F.2d 307, 312 (7th Cir. 1992) (same).

The Plaintiff was a senior ROTC scholarship cadet, at the time of the actions

31

in question.[27]  Sections 2001-2199, of Title 10 of the United States Code, pertain

to the training and education of members of the armed forces, to include ROTC

cadets.  Section 2005 covers "Advanced Education Assistance:  Active Duty

Agreement; Reimbursement Requirements," and provides that the Secretary of the

Army may require, as a condition to providing advanced education assistance to

any person, that such person enter into a written contract under which he agrees -

> (1)  to complete the educational requirements specified in the
>      agreement and to serve on active duty for a period specified in
>      the agreement;
>
> (2)  that if such person fails to complete the education requirements
>      specified in the agreement, such person will serve on active duty
>      for a period specified in the agreement;
>
> (3)  that if such person, voluntarily or because of misconduct, fails to
>      complete the period of active duty specified in the agreement, or
>      fails to fulfill any term or condition prescribed pursuant to clause
>      (4), such person will reimburse the United States in an amount
>      that bears the same ratio to the total cost of advanced education
>      provided such person as the unserved portion of active duty
>      bears to the total period of active duty such person agreed to
>      serve;
>
> (4)  to such other terms and conditions as the Secretary concerned
>      may prescribe to protect the interest of the United States.

10 U.S.C. § 2005(a) (effective 2004) (emphasis added).  In pertinent part, Army

Regulation 145-1 ("Senior Reserve Officers' Training Corps Program: Organization,

---

[27]According to the Eighth Circuit, "Senior ROTC members are required to
swear an oath of loyalty, join a reserve component of an armed force, and agree
both to complete the course of training and to accept a commission for a term of
service in the military following training." Brown v. United States, 151 F.3d 800,
805 (8th Cir. 1998) (citing 10 U.S.C. §§ 2104(b), 2105).

Administration, and Training), provides that a senior ROTC scholarship cadet "<u>will</u>

<u>be disenrolled</u> for the following reasons:"

- <u>Because of withdrawal or dismissal from the academic institution.</u>
  . . .

- <u>Misconduct, demonstrated by</u> disorderly or disrespectful conduct
  in the ROTC classroom or during training, or other <u>misconduct</u>
  <u>that substantially interferes with</u> the ROTC mission, including
  participation in unlawful demonstrations against the ROTC, <u>illegal</u>
  <u>interference with rights of other ROTC students</u>, or similar acts.

- <u>Undesirable character demonstrated by cheating on examinations</u>,
  stealing, unlawful possession. . . .  Such acts may also be
  characterized as misconduct.

- <u>Breach of contract </u>(including formerly used term willful evasion).
  (*Note:*  Breach is defined as any act, performance or
  nonperformance on the part of a student that breaches the terms
  of the contract regardless of whether the act, performance or
  nonperformance was done with specific intent to breach the
  contract or whether the student knew that the act, performance
  or nonperformance breaches the contract).

AR 145-1, ¶ 3-43a(4), (12), (14), (16) ([www.army.mil/usapa/epubs](www.army.mil/usapa/epubs)/pdf/r145_1)

(emphasis added).  Finally, the contract entered into between the Plaintiff and the

Government, in the present case, provides that in return for the Government's

payment of education assistance, the Plaintiff agreed to the following:

- To remain a full-time student at the University of Dayton until he
  received his degree.

- To complete his degree by May 2005.

- To maintain eligibility for enrollment in ROTC, enlistment in the
  USAR, and commissioning, as defined by statute, Army
  regulation, and this contract, throughout the period of the
  Contract.

- If disenrolled from the ROTC program for, among other things,

33

> failing to complete the educational requirements specified in the agreement or other educational requirements for ROTC cadets as specified in Army Regulations or for misconduct, that the Army may order him to active duty as an enlisted soldier or require him to reimburse the Government for his educational costs.

Doc. #19, Attach. #1 (ROTC Contract).

The actions complained of by the Plaintiff were all geared towards LtC. Washington's allegedly improper interference with the University disciplinary hearing, which pertained to the female cadet's allegations of improper sexual advances by the Plaintiff. As is clear by the outcome of that hearing, a potential result of the same was that the Plaintiff might have been suspended from the University. Such an outcome would violate the Plaintiff's obligation under the afore-cited statutory section, Army Regulation and ROTC Contract, to remain a full-time student at the University of Dayton until completion of his degree. Accord United States v. Bush, 247 F. Supp. 2d 783 (M.D.N.C. 2002) (ROTC scholarship terminated due to cadet's misconduct); Molis v. Keenan, 1996 U.S. Dist. LEXIS 847, *2 (N.D.N.Y. Jan. 26, 1996) (ROTC cadet's scholarship removed after he failed to obtain the required grade point average); Rameaka v. Kelly, 342 F. Supp. 303 (D.R.I. 1972) (ROTC cadet's scholarship withdrawn for academic and attendance reasons). For this reason alone, the Army had a vested interest in knowing whether the Plaintiff was to remain a student in good standing at the University of Dayton. Thus, LtC. Washington's actions were more than remotely related to the Plaintiff's status as a member of the military, which is what the Sixth

34

Circuit requires, in a <u>Feres</u> analysis. <u>Fleming v. United States Postal Serv.</u>, 186 F.3d 697, 699 (6th Cir. 1999).

Along these same lines, the Plaintiff was a student at the University of Dayton, pursuant to a ROTC scholarship. Thus, he was "taking advantage of a privilege or enjoying a benefit conferred as a result of military service," which is a relevant consideration in <u>Feres</u> decision. <u>Wake v. United States</u>, 89 F.3d 53, 58 (2d Cir. 1996).

Furthermore, the complained-of actions all involved LtC. Washington's interactions with the ROTC cadets at the University of Dayton. Army Regulation 145-1 describes the responsibilities of a PMS, such as LtC. Washington, as follows:

> Professors of Military Science (PMS) are the key to the success of the ROTC Program. They will —
>
> (1)    Structure and manage the Military Science (MS) Program to blend the philosophies of the host academic institution with the needs of the Army.
>
> (2)    Command the military personnel assigned to the Department of Military Science (ROTC detachment). All personnel assigned to ROTC at the host institution and any extension center will be assigned to this department. They will be directly under the control of the PMS in all matters related to their military status and assigned duties.
>
> (3)    Ensure that the ROTC Program is properly administered as prescribed by applicable statues, DOD Directives, Army regulations, programs, objectives, and policies.

35

AR 145-1, ¶ 1-4i (www.army.mil/usapa/epubs/pdf/r145_1.pdf).  Thus, the PMS

plays an integral role in the functioning of the ROTC component at his or her

assigned academic institution.  For the Court to question LtC. Washington's

interactions with the cadets assigned to his ROTC unit would involve the Court in

just the sort of prying into military affairs, at the expense of military discipline and

effectiveness, that the Feres doctrine cautions against.  Brown v. United States,

462 F.3d 609, 614-15 (6th Cir. 2006).  It is not the judiciary's province to

interfere with how the PMS of a ROTC unit conducts the business of that

organization.

For the reasons set forth above, the Court finds that the Plaintiff's FTCA

claim is barred by the Feres Doctrine.  Therefore, the Defendant's Motion to

Dismiss the Plaintiff's FTCA claim (Doc. #19), for lack of subject matter

jurisdiction, is SUSTAINED.


IV.    CONCLUSION

The Defendants' Motion to Dismiss (Doc. #19) is SUSTAINED, as to

both the Plaintiff's Privacy Act claim and FTCA claim.  Consequently, the

Plaintiff's Motion to Compel Discovery and for Sanctions (Doc. #30) is

OVERRULED, as moot.  Judgment will be entered in favor of the Defendant

and against the Plaintiff herein.

36

All rulings hereunder are made on the condition that the Defendant provides proper Rule 56 evidence of the following documents, to the Court, within ten (10) days of the date of this Order:

- Ensalaco e-mail to Washington, dated February 16, 2004 (Doc. #10, Ex. K7)
- Washington e-mail to Col. Garcia, dated June 18, 2004 (Doc. #16, Ex. B)
- Letter from University of Dayton to LtC. Washington, dated March 18, 2004 (Doc. #10, Ex. K8)
- Department of Army Memorandum, dated October 7, 2005 (Doc. #10, Ex. Q)
- Letter from Attorney Podlaski to Col. Frusha, dated April 12, 2005 (Doc. #10, Ex. I)
- Facsimile from Command Judge Advocate to Attorney Podlaski, dated July 12, 2005 (Doc. #10, Ex. M)
- Letter from Attorney Podlaski to Armor Center Commander, dated December 15, 2005 & Standard Form 95 (Doc. #10, Ex. R)
- Letter from Staff Judge Advocate to Attorney Podlaski, dated December 21, 2005 (Doc. #10, Ex. S)
- ROTC Contract, dated August 26, 2002 (Doc. #19, Attach. #1)

Failing this, the Decision and the Judgment entered hereon will be vacated.

The above captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

March 17, 2008

   /s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:
Counsel of record